CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 1 0 2022

JULIA C. DUDLEY, CLERK
BY: 
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

|  |  |
|---|---|
| **BYRON MATTHEW JOHNSON,** ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 7:20-cv-00642** |
| **v.** ) | |
| ) | |
| **ELDOR AUTOMOTIVE** ) | **By:     Michael F. Urbanski** |
| **POWERTRAIN USA, LLC,** ) | **Chief United States District Judge** |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This matter is before the court on defendant Eldor Automotive Powertrain USA,

LLC's (Eldor) motion for summary judgment pursuant to Federal Rule of Civil Procedure

56(a), ECF No. 16. The issues are fully briefed and a hearing was held in this matter on

December 15, 2021. Plaintiff Byron Matthew Johnson alleges that Eldor violated the contact

for employment he had with Eldor and also violated his rights under the Fair Labor Standards

Act (FLSA) when he complained about lack of compensation for employees of Eldor.[1] For

the reasons stated below the court will **GRANT in part** and **DENY in part** Eldor's motion

for summary judgment.

## I.

Defendant Eldor is a manufacturer of automotive ignition coils, headquartered in Italy,

with facilities or sales offices in Turkey, Brazil, South Korea, China, Japan, and the United

States. Giovanni Scafidi Decl., ECF No. 17-3 ¶ 4. As part of its expansion into the United

States, Eldor broke ground on a facility in Daleville, Virginia in late 2017, and hired plaintiff

---

[1] Johnson originally included Title VII discrimination claims but has since abandoned those claims. ECF No. 21 at 2.

1

Johnson as an Engineering and Maintenance Manager at the facility in June 2017. Id. ¶¶ 10-11. Johnson reported to Fabio Piscone, the Daleville plant manager, and Piscone reported to Giovanni Scafidi, the Chief Operating Officer who resided in Italy. Scafidi Decl., ¶ 18. Bridgett Farmer was the Human Resources Manager at the Daleville plant. Bridgett Farmer Decl. ECF No. 17-2 ¶ 2.

Eldor flew Johnson to Turkey for three to four months to "train[] . . . to get to know the automation itself, . . . [and get] to know their engineering organization, how they proceeded so we could mimic that in the U.S." Byron Matthew Johnson Tr., ECF No. 17-1 at 61-62; Scafidi Decl. ¶ 12. The Turkish plant had the most expertise with the "assembly and testing modules" and training there would "enable [Johnson] to train under the people most familiar with the Line." Johnson Tr. at 62-67, 90. To assist with getting the Daleville plant operational, Eldor sent several Turkish, Italian, and Chinese Eldor personnel to the Daleville plant. Johnson Tr. at 85, 93. Gokhan Bingol was a Turkish engineering manager who was sent to Daleville to work with Johnson so that Johnson's team could cross train and learn from the Turkish engineers. Farmer Decl. ¶ 16. Johnson stated that it was the job of the Turkish employees to "come over and actually get the line installed." Johnson Tr. at 85. Around March 2018, the overseas personnel that Eldor sent to Daleville were finalizing their installation and Eldor thought production would begin at the Daleville plant around October 2018. Scafidi Decl. ¶ 15.

In an effort to become fully staffed with local workers, Eldor attempted to advertise, hire, and train operators and technicians to work on the assembly line, but the process moved slowly and Eldor struggled to find enough qualified and experienced applicants. Farmer Decl.

¶ 8. Johnson thought that there were not enough people manning the plant, so he requested that Eldor send more Turkish workers to assist and Piscone and Farmer obliged. Scafidi Decl. ¶ 16; Farmer Decl.  ¶¶ 9-10. Additionally, Eldor brought in temporary workers from several local staffing agencies to help address the staff shortage. Johnson Tr. at 190-93.

In May 2018, the Daleville plant was to undergo an audit in order to determine if the plant would be able to produce enough parts to begin production by its projected October 2018 start date. Many of the Daleville technicians and engineers were working long hours, including weekends and late nights. Fabio Piscone Decl., ECF No. 17-1 ¶ 12. While Johnson anticipated that there would be some long hours as the plant was starting up, he did not expect that his employees would regularly work these hours. Johnson Tr. at 157-60. As a result of these increased hours, morale was low at the facility. Piscone Decl. ¶ 12; Farmer Decl. ¶ 12. Piscone, Scafidi, and Farmer all encouraged Johnson to motivate and train his team and reassure them that these long hours were only temporary. Scafidi Decl. ¶ 20; Piscone Decl. ¶ 12; Farmer Decl. ¶ 12.

Johnson remained concerned about the staffing level and complained to his employees about the lack of manpower. Piscone Decl. at ¶ 14; Farmer Decl. at ¶ 14. Both Piscone and Farmer advised Johnson that this was inappropriate behavior from a manager, particularly in front of his employees. Eldor did not have these problems at its other international plants, and it appeared to Piscone and Farmer that Johnson was either improperly managing or improperly training his employees. Piscone Decl. at ¶ 9; Farmer Decl. at ¶ 9.

On October 27, 2018, a member of Johnson's team, Benjamin Wilkerson, contacted Scafidi directly via email, bypassing Johnson and Piscone, although he copied Johnson on the

email. Email of Benjamin Wilkerson, ECF No. 17-3 at 65. Wilkerson's email stated that "I hope that by me writing you directly is a sign that things are not well. I would never write you directly if I did not feel that it was necessary. I would love to believe in and trust that my management would, or rather could take care of the issues for us." Id. He went on to say that "we've voiced our concerns for months with no results," and

> Eldor's team here in the US is about to break. I use the word break due to we have been bending very strongly for a long time now. We are all exhausted, under appreciated and continue to have more work piled on. The manpower is extremely low, along with simply not having the right kind of people in place. We are starting to loose [sic] people, and many are looking for other jobs[.]
>
> . . . .
>
> The whole U.S. team is already feeling a lot of pressure from work and from home due to not being at home. Or when we are home we simply can't function properly with our families due to stress and our bodies being worn out from long hours climbing over machines. As I explained, we are extremely understaffed and [Gokhan Bingol] wants the same results and piles more on to the people that are already filling multiple roles. . . .
>
> We need to be properly staffed and given the chance to stand on our own first. We have never been given a fair shot. We have always been working several levels down due to not being staffed properly.

Id. Scafidi responded, acknowledging that Eldor was short-staffed and saying that part of the problem was because the Daleville facility was still new.

> This is a reason why we are sending Turkish colleague[s] over there to occupy the vacant position supporting you, because it is our responsibility don't [sic] leave you alone with the problem but have people that [ ] face[d] the same problem in the past over there to support you.

Email of Giovanni Scafidi, ECF No. 17-3 at 65. Despite acknowledging the difficult work environment, Scafidi felt like it was Johnson's job to increase morale amongst his employees and did not believe he was doing so. Scafidi Decl. ¶ 23.

In response to Scafidi's email, Wilkerson responded in another email dated October 29, 2018, again copying Johnson. Wilkerson reiterated that his biggest concern was lack of staff and said that he found it difficult for someone to have "respect for our management team with all the hours, confusion, and strong opinions." Wilkerson Email, ECF No. 17-3 at 64.

On October 29, 2018, Wilkerson emailed Piscone and Farmer, with a copy to Johnson, stating he was worried about a plan to hire temporary workers from a staffing agency: "I am worried that we can barely manage the people we have, now we are going to bring in people that have a hard time finding jobs on their own." Wilkerson Email, ECF No. 17-1 at 15. Piscone and Farmer agreed with Wilkerson that hiring temporary workers was problematic and stated that Eldor intended to hire more permanent workers. Farmer and Piscone Emails, ECF No. 17-1 at 15.

On October 30, 2018, Scafidi forwarded Wilkerson's October 27 email to Eldor's United States managers, including Johnson, acknowledging the lack of staffing and asking them to continue to communicate with one another. Scafidi Email, ECF No. 17-3 at 64. Piscone asked Farmer to set a management meeting and come up with proposals to address the issues raised. Piscone Email, ECF No. 17-3 at 64.

Johnson testified that in November 2018, he had "brought up to [Piscone] that [he'd] found the legality in Virginia being you can't work a non-engineer over forty hours without some kind of compensation." Johnson Tr. at 198. Johnson suggested that employees receive

5

time-and-a-half pay after fifty hours of work, and if they worked more than fifty-five hours that they be allowed to put hours in a "flex time bank." Id. at 199. Johnson also testified that "[i]t wasn't the first time that we met with Scafidi, but by the second time that we met with Scafidi, I did mention that in our meeting that we needed to comply with Virginia law with the overtime[,]" and "Scafidi and Piscone were in the same meeting room[,] Scafidi said, 'absolutely, if it's within the Virginia law, then we need to do something. We need to comply with whatever that is.'" Johnson Tr. at 220-21.

Piscone and Farmer believed Johnson was not leading the team properly and that many of Wilkerson's complaints were what Piscone and Farmer were trying to address with Johnson. Piscone Decl. ¶ 18; Farmer Decl. ¶ 18. In November 2018, Piscone and Farmer began meeting with Johnson in order to help him incorporate Scafidi's directives into Johnson's management. These meetings took the form of weekly "action meetings." Piscone Decl. ¶ 19; Farmer Decl. ¶ 20. The meetings focused on how Johnson could motivate his team to meet deadlines. Piscone Decl. ¶ 19. Scafidi traveled to the Daleville plant to meet with Johnson and his team to encourage them and assure them that the results of their hard work would be rewarding. Scafidi Decl. ¶ 26.

Piscone and Farmer stated that they continued to worry that Eldor employees were confused, overworked, and lacked morale. Piscone Decl. ¶ 20; Farmer Decl. ¶ 21. Piscone and Farmer blamed Johnson for the work situation and decided to put him on a Performance Improvement Plan ("PIP"). The PIP gave Johnson 60 days to improve his performance, accomplishing three main objectives: (1) motivating his team in accordance with Eldor's values; (2) disciplining and providing technical training to his team to get results; and (3)

improving scheduling to satisfy the cross-training objective. Johnson's PIP was finalized on

December 10, 2018, but he did not meet with Piscone and Farmer until December 12, 2018.

Farmer Decl. ¶ 31; PIP, ECF No. 17-2 at 33-34.

On December 11, 2018, before the PIP meeting, Johnson emailed Scafidi stating that

he had lost faith in Eldor and said:

> My concern is with employee expectations and employee
> happiness. . . . We are asking my [employees] to work [hours] of
> overtime without a hint of compensation. We are asking them
> [to] come early, stay late, be on call, and run the line. As I have
> pointed out many times, overtime, staying late all of these are
> expected but expected to come and go not be steadily high.

Email from Matt Johnson dated December 11, 2018, ECF No. 17-3 at 70.[2] Johnson told

Scafidi that he needed "some measure of relief for the group" and suggested bonuses. Id. He

added, "My team keeps mentioning being taken advantage of. I redirect the comment every

time however I need support to continue to redirect it." Id.

On December 12, 2018, Piscone and Farmer met with Johnson to give him the PIP.

Johnson testified that prior to the PIP, he had never received a performance evaluation,

Scafidi and Farmer had told him he was doing an excellent job, and they had never counseled

him about his performance. He did not agree that he had performance issues but he believed

that if he did not sign the PIP, he would lose his job. Johnson Tr. at 351-53.

Later that day, Wilkerson again emailed Scafidi and copied Piscone, Johnson, and

Farmer. Wilkerson's second email to Scafidi described how many hours he had worked and

---

[2] Although Johnson uses the word overtime, "he is not referring to pay at the rate of time and one-half over
forty hours per workweek for non-exempt workers. Rather, he is referring to when an exempt employee works
more than what would be expected in a normal workweek, such as when the employee works more than 50 or
55 hours." See ECF No. 17 at 21 n.5; Johnson Tr. at 198-200; Scafidi Decl. ¶ 28.

how he had needed to leave for a personal matter but was asked to stay later. When he asked why he needed to stay later, he was told that supervisor Gohkan Bingol wanted him to stay. He added that "No actual reason or explanation was given nor could one be provided because [Johnson] did not know." Email from Benjamin Wilkerson, ECF No. 17-3 at 72.

On December 13, 2018, Scafidi responded to Johnson's December 11, 2018 email. He indicated that paying additional compensation would help address concerns raised by Johnson and advised him to talk to Farmer and Piscone about additional compensation, and then encouraged Johnson to become a better leader. Scafidi told Johnson that "this is the point where you have to improve in managing your team, in LEADING [your] team, giving direction, listen[ing] [to] them, communicating with them." Scafidi also made Johnson aware that he received another email from Wilkerson. Email from Giovanni Scafidi, ECF No. 17-3 at 70. In response, Johnson stated that "I agree fully that my management needs to improve greatly. I have and will continue to improve on this if given the chance." He stated that he believed conditions were improving but that he "was simply approaching the limit that [employees] are willing to give." Wilkerson Email, ECF No. 17-3 at 72. Johnson also apologized for reaching out directly to Scafidi as this was against Eldor's policy of bypassing an immediate supervisor. Id.

Piscone and Farmer stated that based on Wilkerson's second email to Scafidi, they no longer believed the PIP was the appropriate corrective action and decided to terminate him to avoid losing engineers and technicians. Farmer stated that she believed Johnson was "foster[ing] ill will and negativity among the maintenance and engineering team." Piscone Decl. ¶ 24; Farmer Decl. ¶¶ 25-26. On December 13, 2018, the day after Johnson signed the

PIP, Piscone and Farmer met with Johnson and asked if he had spoken with Wilkerson regarding his first email to Scafidi as he was instructed, and Johnson replied that he had not. Farmer Decl. ¶ 27. In addition, Farmer stated that she and Piscone suspected that Johnson may have assisted Wilkerson in writing the emails. Id. Johnson was terminated that same day.

On November 2, 2020, Johnson brought suit against Eldor, alleging, among other things, retaliation in violation of the Fair Labor Standards Act ("FLSA") and a breach of his employment contract. Eldor argues that it is entitled to summary judgment as a matter of law because Johnson did not engage in a protected FLSA activity and even if he had, he did not give Eldor sufficient notice that he was participating in an FLSA protected action. Eldor also asserts that Johnson was terminated for cause and therefore his termination did not violate the employment contract. ECF No. 17.

## II.

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment

unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

### III.

### A.     Protected FLSA Activity

The FLSA was enacted by Congress to protect employees from detrimental labor conditions and provide for the general well-being of workers. Monahan v. County of Chesterfield, Va., 95 F.3d 1263, 1267 (4th Cir. 1996). With some exemptions, the FLSA "requires that an employer pay overtime at a rate of one and a half times an employee's regular rate for all hours worked in excess of forty per week." Id. (citing 29 U.S.C. § 207(a)(1)). Employees who are exempt generally include those employed in a bona fide executive, administrative, or professional capacity. Darveau v. Detecon, Inc., 515 F.3d 334, 337 (4th Cir. 2008) (citing 29 U.S.C. § 213(a)(1)).

In addition to its wage and hour requirements, the FLSA makes it illegal for an employer to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . . ." 29 U.S.C. § 215(a)(3). To prove an FLSA retaliation claim, a plaintiff must show that (1) he engaged in an FLSA protected activity; (2) he suffered an adverse action at the same time or after engaging in an FLSA protected activity; and (3) a casual connection exists between plaintiff's participation in an FLSA protected activity and the adverse action. See Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1042 (4th Cir. 2020) (citing Darveau, 515 F. 3d at 340). "If the employee can make out the prima facie case, the burden would then shift to the employer to articulate a legitimate reason for the termination

other than retaliation for the employee's protected activity . . . . If the employer carries that burden, then the employee must prove by a preponderance of the evidence that the employer's explanation was only a pre-text for illegal retaliation." Chmura Econ. & Analytics, LLC v. Lombardo, No. 3:19-cv-813, 2021 WL 3234607, at *20 (E.D. Va. July 29, 2021).

The FLSA recognizes three forms of protected activity: "[1] filing any complaint or [2] institute[ing] or caus[ing] to be instituted any proceeding . . . [or] [3] . . . testify[ing] or [being] about to testify in any such proceeding [or serving or being about to serve on an industry committee]." Minor v. Bostwick Labs., Inc., 669 F.3d 428, 433 (4th Cir. 2012). Guided by the Supreme Court's decision in Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1 (2011), the Minor court found that filing an intracompany complaint constitutes a protected FLSA activity. See Minor, 669 F.3d at 439.

An oral complaint regarding an FLSA violation can constitute a protected activity, see Kasten, 563 U.S. at 17, but "the employee's complaint must give the employer fair notice[,]" Chmura, 2021 WL 3234607 at *21, such that the complaint must have "some degree of formality" and "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." Kasten, 563 U.S. at 14. An employee "letting off steam" does not constitute a protected activity. Minor, 669 F.3d at 439. Nor does "a mere request for overtime pay without more details or reasoning as to why the employee is entitled to overtime compensation[.]" Sanchez v. Caregivers Staffing Servs., Inc., No. 1:15-cv-01579, 2017 WL 380912, at *3 (E.D. Va. Jan. 26, 2017); see also Romero v. Granite Ctr., LLC, No. 1:16-cv-01039, 2017 WL 2642971, at *3 (E.D. Va. June 19, 2017) (holding that an employee who

12

complained multiple times that he was not paid for all of the hours that he worked did not engage in an FLSA protected activity because the employee did not specify a statute or law that his employer violated by not paying him).

The question here is whether Johnson's complaints about lack of staffing and requests for incentive pay and overtime for Eldor employees constituted an FLSA protected activity such that Johnson's activity put Eldor on sufficient notice of its alleged FLSA violation. Johnson asserts that he had concerns regarding "legality in Virginia being you can't work a non-engineer over forty hours without some kind of compensation" and that he had expressed his concerns to Piscone. Johnson Tr. at 198-99. Furthermore, Johnson avers that his December 11, 2018 email to Scafidi concerning employees working "many [hours] of overtime without a hint of compensation," raised FLSA concerns. Johnson Dec. 18, 2018 E-Mail to Scafidi, ECF No. 21-3. He argues that taken together, his oral and written complaints amount to filing an FLSA intracompany complaint, which provided Eldor with adequate notice of its alleged FLSA violation. ECF No. 21 at 7-8.

At argument, Johnson cited Jafari v. Old Dominion Transit Mgmt. Co., 913 F. Supp. 2d 217 (E.D. Va. 2012), aff'd, 538 F. App'x 238 (4th Cir. 2013), in support of his contention that his activities constituted an intracompany complaint protected under the FLSA. In Jafari, the plaintiff began work as a transportation supervisor for a government-owned bus company in February 2006. In November 2006, the bus company changed its compensation plan, which included an increase to the salary range for Jafari's pay grade classification. On November 27, 2006, the plaintiff wrote a letter to the bus company's human resources director alerting her that his pay fell below the new minimum provided in the bus company's new compensation

plan. The director wrote back that Jafari's concerns would be addressed at his employee evaluation. In March 2007, the employee evaluation took place, and Jafari's annual salary increased. In October 2007, an issue arose concerning Jafari's dealings with a customer. Jafari wrote to his immediate supervisor and the human resources director on November 6, 2007, and December 5, 2007, respectively, stating that management unfairly handled the customer complaint incident, that his job was supervisory, and he thus should get a pay hike; his job was non-supervisory and therefore he should receive overtime pay under the FLSA; and that he deserved additional salary for on-call work. Jafari, 913 F. Supp. 2d at 221. On February 1, 2008, Jafari was terminated for violating company policy for mishandling a customer complaint. Jafari sued the bus company, alleging, among other things, retaliation in violation of the FLSA.

The Jafari court found the November 27, 2006 letter was not an FLSA protected complaint because "[t]he letter d[id] not complain of unpaid overtime or minimum wage violations or explicitly refer to the FLSA." Id. at 226. However, the court found both of his 2007 letters were FLSA protected complaints because they complained of unpaid overtime and mentioned the FLSA explicitly. Id. at 227. As such, the court concluded that Jafari presented sufficient evidence to establish a prima facie case of FLSA retaliation. Id.

In its rationale, the Jafari court explained why it considered Jafari's 2007 letters to be protected under the FLSA.

> Although somewhat rambling, the communications do in some manner invoke the protection of the FLSA. Incongruously, Jafari complains, on the one hand, that his position was supervisory and that he should receive a pay hike to reflect his actual supervisory responsibilities. On the other hand, Jafari also says in his correspondence that because his job is non-supervisory, he is

14

entitled to overtime pay. Jafari also complains that he is entitled to additional wages for On-Call work. Whatever the merits of his grievances, in both 2007 complaints, Jafari explicitly invokes a right to overtime pay under the FLSA. While [the bus company] rightly points out that the mere inclusion of the term "FLSA" in a complaint does not automatically render the complaint into an assertion of rights under or related to the FLSA, it is plain in this case that part of Jafari's complaint in each letter is that he should not be considered exempt from the FLSA's overtime pay provisions.

Jafari, 913 F. Supp. 2d at 227. Johnson's case differs from Jafari in that Johnson's emails and complaints at most made a confused reference to the FLSA and they do not explain why the salaried employees would be entitled to overtime. While the Jafari court notes that the mere mention of the FLSA does not automatically create a claim, the explicit invocation of the FLSA in a complaint assists in objectively giving an employer adequate notice of an alleged FLSA violation. Unlike Jafari, Johnson's amorphous mention of possible wage law violations and bonus pay proposals are insufficient to warrant protection under the FLSA.

Johnson also asserts that a co-worker can corroborate his alleged FLSA complaints. Robert Helms was a production line manager at Eldor, and Johnson avers that Helms's testimony supports the notion that Johnson "advocated for overtime rights[.]" ECF No. 21 at 6.

> Q: Did you ever have any conversations with Mr. Johnson while you were both working there about whether some of these workers on these shifts were being paid proper overtime?
>
> A: Yes, we did.
>
> Q: Did Mr. Johnson - - it's characterized in his lawsuit that he brought these concerns to management at Eldor. Did you know him to do that?
>
> A: Yes.

> . . .
> Q: Is it your understanding that Mr. Johnson had conversations about overtime with either Bridgette Farmer or Fabio Piscone?
>
> A: Yes.

Robert Helms Tr., ECF No. 22-1, at 10-11.

However, when read in its entirety, Helms's testimony cuts against Johnson's argument. First, Helms states that he spoke with Piscone and Farmer about "trying to find ways to keep [the] team motivated[,]" and that he could not speak for "[Johnson's] side, [so Helms] was not concerned about the legality of it. [He] was more concerned about the morale, the morality of keeping our workers happy. . . . We had conversations about compensation and also like comp time." Helms Tr. at 10-11. And, when asked by counsel to clarify what he meant by "overtime," Helms testified "it wasn't a time and a half rate," but instead was for a salaried worker as "a rate above their base pay that they were compensated for working weekends." Id. at 40. Additionally, Helms testified that "I believe now and I believe then that [Piscone] was in the same feeling that we were working a lot of hours and what could we do to motivate our team." Id. at 13. Helms also testified that he was not present for any conversation that Johnson had with other managers at the plant. Id. at 11-12.

On balance, Helms's testimony supports a showing that Johnson attempted to introduce pay incentives and a bonus program in order to combat low morale at the facility. These types of activities are not protected FLSA activities.

In addition, Eldor argues that even if Johnson engaged in an FLSA protected activity, his complaints did not give Eldor sufficient notice of its alleged FLSA violation. Johnson stated that he learned from the Internet that it was illegal to work an "associate engineer, like

16

a two-year engineer, or a non-degreed engineer over 40 hours" and he gave this information to Piscone. Johnson Tr. at 216-217. In response to a question about whether he had told Farmer and Piscone "that it was illegal in Virginia for a person with an associate's degree to work more than 40 hours, Id. at 218, Johnson responded:

> So there was a Fair Labor Standards Act, I believe it is, document I found online. When, you know, the guys were being – you know, they were saying oh, you know, we can't work X amount. You know, this is – it's unfair, blah, blah, blah. [An engineer] had brought up I believe a place where he priorly – prior worked got sued over that and I was like, would you care to spend a few minutes looking that up for me? He did find the document and it said specifically that in certain situations, when you're doing machine maintenance and things like that, if you don't compensate them, it's illegal in some way. I don't remember the specifics of it. . . . But I brought that up to them about, you know, it's not only the act that they feel taken advantage of. It's also - it looks like – we need to look into the fact that we might be breaking a law. . . ."

Id. at 218-19. Johnson also raised the issue to Piscone and Scafidi that he had "found the legality in Virginia being you can't work a non-engineer over 40 hours without some kind of compensation" and that Eldor needed to comply with Virginia overtime laws. Id. at 198-199; 220-221.

In Lott v. Not-For-Profit Hosp. Corp., 296 F. Supp. 3d 143 (D.D.C. 2017), the plaintiff was the chief compliance officer for a non-profit corporation. When another employee was terminated, Lott alleged that the termination "maybe [ran] afoul of the [Family Medical Leave Act ("FMLA")], the [District of Columbia Human Rights Act], and that the hospital needed to comply with federal and District of Columbia laws." Id. at 154. Lott was terminated approximately six weeks later and argued that the corporation retaliated against him because he had asserted that the employee was terminated for taking FMLA leave and asked that she be reinstated. The court dismissed the claim, finding that Lott did no more than offer a "half-

hearted opinion" qualified by the word "maybe" about the company's potential liability and that Lott "gave rather obvious advice that [the company] had to comply with the law." Id.

While Lott is an FMLA case rather than an FLSA case, it is still instructive. Johnson informed Eldor that it may have run afoul of an unspecified Virginia wage law and the FLSA but he did not appear sure that any statute had been violated. Johnson's advice that Eldor must comply with Virginia law and should look into whether it was violating the FLSA was inadequate to give Eldor notice that Johnson was engaging in an FLSA protected activity or asserting an FLSA violation. Rather, Johnson appeared to be notifying Piscone and Scafidi that Eldor could be at risk of violating wage laws. As in Lott, Johnson's raising of a possible violation of the FLSA is insufficient to put Eldor on notice.

Additionally, Johnson's statement to staff about needing more manpower is insufficient to prove that Johnson engaged in a protected FLSA activity. Pursuant to Minor, Johnson "letting off steam" regarding his belief that the plant was understaffed does not rise to the level of filing an intracompany complaint. Moreover, the FLSA does not address staffing woes of a company but rather the wages of the employees who are already working there.

In addition, Johnson acknowledged at his deposition that the people he hired were exempted from overtime pay under the FLSA. Johnson Tr. at 158-159. His assertion is consistent with a narrative of events he prepared after his termination. Regarding payment of additional compensation, Johnson wrote:

> I later proposed that we could give a bonus to the guys who were putting in maximum effort or pay them straight time for any [hours] worked after 60 [hours]. This seemed to be considered . . . . I send [sic] an email to the COO and explained that I needed something to keep the team morale up. I asked if we could move

> forward on the straight pay after 60 [hours] or suggestions on
> how to keep them from being angry at the high demands.

Ex. 34 to Johnson Tr., ECF No. 17-8, at 135, and Johnson Tr. at 251-52, 258. Johnson did

not indicate that he thought the employees were entitled to additional compensation under

the FLSA. Rather, he appears to have argued that the employees were demoralized by the long

hours they were working and thought they deserved additional compensation to acknowledge

their efforts and to act as an incentive to keep them working.

In sum, Johnson's arguing for an employee pay incentive and bonus proposal did not

put Eldor on notice of an FLSA violation. Rather, he appeared to be arguing that Eldor should

provide additional compensation to the salaried employees for their continued hard work and

long hours.[3]

Finally, the court is persuaded by the "manager's rule" reasoning articulated in other

circuits that in order to adequately put an employer on notice, a manager must "step outside

his or her role of representing the company" to alert an employer that they are engaging in an

FLSA protected activity. McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996).

Several circuits have adopted this rationale. See e.g., McKenzie, 94 F.3d at 1486; Hagan v.

Echostar Satellite, LLC, 529 F.3d 617, 628 (5th Cir. 2008); Claudio-Gotay v. Becton Dickinson

---

[3] On brief, Johnson argues that Eldor's argument is disingenuous because in an earlier case involving Eldor, the parties reached a joint settlement where they admitted that "there did exist at least some evidence that Process Engineers performed some non-maintenance work. Defendant, for its part understood it faced meaningful exposure during the early periods of the plant's operation when engineers worked particularly long hours and, in a capacity different from how they operate today." ECF No. 21 at 5-6 (citing Broussard v. Eldor Auto. Powertrain USA, LLC, No. 7:19-cv-841 (W.D. Va. Dec. 13, 2019), Joint Mem. in Supp. of Approval of Stip. Settlement, ECF No. 23, at 2). However, Broussard was filed more than one year after Johnson was terminated, and he was not a party in the Broussard case. Furthermore, Johnson points to no nexus between the Broussard case and his own. That Eldor came to recognize that it may have owed some employees overtime pay under the FLSA does not lead to the conclusion that Johnson engaged in protected activity under the FLSA based on the record before this court.

Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004). While the Fourth Circuit has expressly rejected the application of the "manager's rule" in the Title VII context, it is silent as to its applicability in the FLSA context. See DeMasters v. Carilion Clinic, 796 F.3d 409, 421 (4th Cir. 2015) ("[W]hatever place [the manager's rule] may have in FLSA jurisprudence, the manager rule does not apply to Title VII[.]").

The McKenzie reasoning "purports to address a concern that, if counseling and communicating complaints are part of a manager's regular duties, then nearly every activity in the normal course of a manager's job would potentially be protected activity, and an otherwise typical at-will employment relationship could quickly degrade into a litigation minefield." DeMasters, 796 F.3d at 421. A manager must make it clear that they are stepping out from their managerial position and asserting an FLSA claim in order to constitute proper notice to an employer. In McKenzie, the plaintiff was a manager and personnel director for her company. After she received pamphlets from a coworker who returned from a seminar on wage and hour laws, the manager became concerned that various employees at the company were not being adequately compensated for working overtime. The manager discussed her concerns with the coworker who provided the pamphlets, the company's attorney, and the president of the company. Two weeks later, she was fired.

She sued her employer, alleging retaliatory discharge in violation of the FLSA. After a jury verdict in her favor, the defendant filed for judgment as a matter of law, and the district court granted the motion. On appeal, the Tenth Circuit affirmed the district court's ruling, holding the following:

> Here, McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee

lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company. McKenzie did not initiate a[n] FLSA claim against the company on her own behalf or on behalf of anyone else. Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations. . . . There is no evidence in the record to suggest that McKenzie was asserting any rights under the FLSA or that she took any action adverse to the company; rather, the record reflects that McKenzie's actions in connection with the overtime pay issue were completely consistent with her duties as personnel director for the company to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA.

McKenzie, 94 F.3d at 1486-87.

Like McKenzie, Johnson never stepped outside of his role as a manager to assert an FLSA violation. Rather, he proposed a bonus program and initiative proposal to combat the low morale of his employees. Moreover, even if he advised that Eldor was violating wage laws, that action is consistent with his managerial duty to assist the company in complying with its legal obligations. Proposing incentives for employees and cautioning other Eldor managers about possible wage violations is well within Johnson's managerial position.

For all the above-stated reasons, the court finds that Johnson did not engage in protected activity under the FLSA. Accordingly, the court finds that and Eldor is entitled to summary judgment on this issue.

## B. Breach of Contract Claim

Johnson contended at the hearing that if he did not prevail on his FLSA claim, he could not prevail on his breach of contract claim. However, after reviewing the evidence in this case,

the court finds that despite finding that Johnson did not suffer a retaliatory discharge, fact issues preclude a finding that Eldor did not breach the employment contract.

In relevant part, Johnson's contract read as follows:

> 6.1     Except as otherwise provided herein, in the event Employee's employment is terminated by the Company other than for Cause, Employee shall have the right to receive severance compensation equal to three (3) months of Employee's then current base salary; and employee will also be paid earned but unpaid base salary through the date of termination and earned but unused vacation days, and may be eligible for continued benefits as required by law.
>
> 6.2     In the event Employee (i) resigns or (ii) his employment is terminated by the Company for Cause, Employee shall thereafter have no right to receive compensation or other benefits (including severance compensation) from the Company, except for earned but unpaid base salary and unused vacation days, and except for continued benefits as required by law.
>
>> For purposes of this Agreement, termination for "Cause" shall include termination for (i) breach of this Agreement by Employee which breach is not cured within five (5) days of receipt by Employee of written notice from the Company specifying the breach; (ii) employee's gross negligence in the performance of his material duties hereunder; (iii) Intentional nonperformance or misperformance of such duties, or refusal to abide by or comply with the reasonable directives of the Company, or the Company's policies and procedures, which actions continue for a period of at least five (5) days after receipt by Employee of written notice of the need to cure or cease; [and] (iv) Employee's willful dishonestly, fraud or misconduct with respect to the business or affairs of the Company[.]

Employee Agreement, ECF No. 21-6. Thus, in order for Johnson's termination to have violated the contract, Johnson must show that he was not fired for cause. Eldor asserts that Johnson was grossly negligent in the performance of his material duties. ECF No. 17 at 25.

In explaining Johnson's termination, Eldor asserts that Johnson did not know how to make work schedules or direct his team as to their working times. He did not instruct them on how to use their paid time off and he did not supervise their clocking in and out. On one occasion a question arose about where an employee needed to park and Farmer asserts that Johnson handled it improperly. Farmer Decl. at ¶ 13. Johnson disputes Farmer's description of those issues and how they were handled. Johnson Tr. at 177-188.

Eldor also asserts that rather than have the foreign engineers that Eldor sent to the Daleville plant teaching Johnson's team as they were supposed to do, Johnson was improperly using the foreign engineers as hired help. Piscone Decl. at ¶¶ 13-15; Farmer Decl. at ¶¶ 16, 20. Eldor also contends that Wilkerson's emails blamed Johnson for a lack of leadership and low employee morale. After Scafidi received Wilkerson's emails, he emailed Piscone and Farmer, copying Michele Ciavola, Bingol, and Johnson, requesting that they improve their communication with and motivate their team members. Scafidi Email, ECF No. 17-8 at 120. Piscone and Farmer assert that Wilkerson's email meant that he "was complaining about a lot of the issues [they] were trying to address with Mr. Johnson[,]" and they began holding weekly "action meetings" with Johnson in order to help him incorporate Scafidi's requests into his management. Piscone Decl. at ¶¶ 18-19; Farmer Decl. at ¶¶ 19-20.

Piscone and Farmer claim they saw little improvement in Johnson's management and "were extremely worried [they] were going to keep losing process engineers and technicians who were confused about their roles, felt overworked, and lacked direction—all management issues Mr. Johnson was responsible for addressing." Piscone Decl. at ¶ 20; Farmer Decl. at ¶ 21. On December 12, 2018, Piscone and Farmer put Johnson on the PIP. Piscone Decl. at ¶¶

21-22; Farmer Decl. at ¶¶ 22-23. Later that day, Wilkerson again emailed Scafidi voicing his displeasure with the plant's conditions and management. As a result of Wilkerson's second email to Scafidi, Piscone and Farmer confronted Johnson and inquired whether he spoke to Wilkerson following his first email to Scafidi as he was instructed to do. Piscone Decl. at ¶ 25; Farmer Decl. at ¶ 26. Johnson admitted that he had not, and Piscone and Farmer assert that "it was frustrating" because Johnson had been asked to have a "simple conversation" with Wilkerson and had failed to do so. Piscone Decl. at ¶ 25; Farmer Decl. at ¶ 27.

Piscone and Farmer next state that Farmer asked Johnson if he had helped Wilkerson write the emails and he responded that he could not answer the question. They then state the following:

> That was the final straw. Not only did Mr. Johnson disregard Mr. Scafidi, Ms. Farmer, and my direction to meet with Mr. Wilkerson after Mr. Wilkerson's first email, now it appeared that Mr. Johnson may have assisted Mr. Wilkerson (his subordinate) in writing these emails. We believe this warranted cause for termination. We had lost all confidence in Mr. Johnson as a manager and team member. Mr. Johnson seemingly took every negative opportunity to undermine the Company, including in front of his subordinates, instead of maintaining a positive and forward-thinking attitude needed by the Company and his employees during a stressful time.

Piscone Decl. at ¶ 25; Farmer Decl. at ¶ 27. This explanation of "the final straw" for Johnson's termination raises more questions than it answers. Piscone and Farmer accuse Johnson of both failing to talk to Wilkerson about Wilkerson's concerns and advising him to raise the concerns. It is unclear how Johnson could engage in both of these acts and if Piscone and Farmer are unsure of his conduct, it is unclear how they could terminate him for being grossly negligent in the performance of his material duties.

24

In addition, a review of Wilkerson's emails shows that his complaints were overwhelmingly about lack of staff and the hours that the employees were being asked to work and he never singled Johnson out for criticism. In his first email to Scafidi, he complains that he had voiced his complaints to "management" without results. He does not name any particular manager and given the content of the email he could be complaining about Johnson, Piscone, Farmer, or any combination of them. He copied Johnson on the email but did not copy Piscone or Farmer. Wilkerson Email, ECF No. 17-3 at 65. In his second email he said that "Its [sic] very hard for someone at this point to have respect for our management team with all the hours, confusion, and strong opinions." Wilkerson Email, ECF No. 17-3 at 64. Again, he did not complain about Johnson specifically and copied Johnson, but not Piscone or Farmer on the email.

Nor in the third email, sent shortly before Johnson was terminated, did Wilkerson complain about Johnson. Rather, he complained vehemently about the extra hours he was being asked to work, and in particular about being asked to return to work after needing to take time off to attend to a personal matter. The only explanation he was given was that Bingol wanted him to return to work and he added that Johnson could not explain why he needed to stay because Johnson did not know why he needed to stay. Wilkerson Email, ECF No. 17-3 at 72. Eldor claims Wilkerson was complaining about Johnson in the email, but an equally reasonable interpretation is that Wilkerson was complaining about Bingol.

Johnson asserts that prior to the PIP, he had never received a performance evaluation and that Scafidi, Pisocone, and Farmer had told him he was doing an excellent job. Johnson Tr. at 351-52. He testified that he had never been counseled about his work performance and

that although he disagreed with the PIP, he signed it out of fear of losing his job. Id. at 352-53. Johnson's assertion is supported by Scafidi, who stated that after receiving Johnson's December 13, 2018 email, he "praised Johnson for implement a new scheduling idea that would alleviate stress from Mr. Wilkerson." He encouraged Johnson to lead his team by giving them direction and communicating with them. "I reiterated to Mr. Johnson that I believed in him and that he had a lot of room to improve but that in the long run it would make him and his team happier." Scafidi Decl. ¶ 30. Scafidi never spoke with Piscone or Farmer about the email from Johnson and "was later advised by Mr. Piscone that he and Ms. Farmer had terminated Mr. Johnson." Id. ¶ 30.

Looking at these facts in the light most favorable to Johnson, a jury could find that he was not grossly negligent in the performance of his duties and that his termination violated the terms of his contract. The facility was understaffed through no fault of Johnson and when Johnson was told that he needed to motivate his team, he tried to do so by suggesting that they receive additional compensation to offset the large number of hours they were expected to work. His suggestion was met with approval by Scafidi, the Chief Operations Officer, but nevertheless he was terminated by two other members of the Daleville facility management team, whose explanation for doing so is internally inconsistent.

Given these facts, the court cannot find as a matter of law that Johnson was terminated for cause. It is for a jury to determine whether that was the case, or whether he was scapegoated by Piscone and Farmer in response to employees going around them to express concerns to Scafidi about the chronically understaffed facility and overworked employees. Accordingly, Johnson may proceed on his breach of contract claim.

## IV.

For the reasons stated above, Johnson is unable to prove his FLSA retaliation claim. His vague mention of compliance with wage laws and his bonus pay incentive proposals are not protected FLSA activities. Moreover, even if they were protected activities, they were inadequate to provide Eldor with sufficient notice of its alleged FLSA violation. Accordingly, the court **GRANTS** Eldor's motion for summary judgment on Johnson's FLSA claim.

Also for the reasons set forth above, fact issues preclude entry of summary judgment on Johnson's breach of contract claim. Thus, the court **DENIES** Eldor's motion for summary judgment on Johnson's breach of contract claim.

An appropriate order will be entered.

Entered:   01 − 10 − 2022

Michael F. Urbanski
Chief United States District Judge